**Opinion issued September 28, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-22-00362-CR**

_____

**VITO MARRUGO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 183rd District Court**
**Harris County, Texas**
**Trial Court Case No. 1639668**

---

**MEMORANDUM OPINION**

Appellant Vito Marrugo was indicted for the felony offense of burglary of a habitation. The indictment alleged that, with the intent to commit assault, Marrugo entered the habitation owned by Jennifer Moore without her effective consent on July 21, 2019. *See* TEX. PENAL CODE § 30.02(a)(3). The indictment also contained

two enhancement paragraphs alleging that Marrugo had previously been convicted of the felony offence of robbery in 1993 and of the felony offense of possession of a controlled substance in 2008. A jury found Marrugo guilty of the charged burglary offense, and, after finding the enhancements paragraphs to be true, assessed his punishment at 25 years in prison. *See* TEX. PENAL CODE § 12.42(d) (providing that double-enhanced felony has minimum 25-year sentence).

In two appellate issues, Marrugo challenges his conviction (1) by contending that the evidence was insufficient to support the jury's guilty finding and (2) by asserting that the trial court abused its discretion when it prohibited him from eliciting certain testimony from Moore about her past felony convictions and about her deferred-adjudication status. Because they are without merit, we overrule Marrugo's issues, and—after correcting a clerical error in the judgment sua sponte—we affirm the trial court's judgment as modified. *See* TEX. R. APP. P. 43.2(b).

## Background

In July 2019, Moore lived in a house on Marine Street with her son. She and Marrugo had been in a romantic relationship for a year and a half. At trial, Moore testified that Marrugo "was supposed to move in with us, but he didn't because . . . all we ever did was fight." She stated that Marrugo lived with his mother. Evidence showed Marrugo's mother lived on Havner Street. Moore testified that Marrugo would sometimes spend the night or a weekend at her house. He kept a couple of

2

changes of clothes there but did not store clothes in a closet or in a drawer. Moore stated that she rented the Marine Street house and that her name was on the lease. Moore could not recall whether Marrugo's name was also on the lease but testified that Marrugo did not have a key to the house. Moore testified that she lived in the house for about a year and a half. She said that Marrugo gave her "a couple hundred dollars once" but had not otherwise provided money toward rent for the house.

Moore also testified about the events that occurred on July 21, 2019. That night, she and Marrugo went to dinner with "his stepmom and stepdad." They asked Moore why her lip was split, and she told them to ask Marrugo about it. Marrugo admitted that he had hit Moore, splitting her lip.

After dinner, Marrugo and Moore left in her car. Moore testified that, as she drove, Marrugo became angry about being compelled to confess at dinner that he had hit her. Marrugo grabbed the steering wheel, causing the car to sideswipe a wall. Moore stopped the car, and Marrugo got out. Moore then drove away, leaving Marrugo along the road. Moore drove to her house. She locked the door and grabbed her phone. She said that her son was not there because he was staying with her mother, who lived behind her.

Moore testified that, after she arrived home, Marrugo came to her front door and knocked. She said that she thought that Marrugo would kill her. Moore told Marrugo, "Please, go away, Vito. Please, go away." Marrugo refused to leave,

3

continued knocking, and demanded that Moore open the door. Marrugo then broke the window next to the front door with his fist, "lunged through it," and punched Moore in the head, causing her to fall to the floor.

In the audio from a 9-1-1 call placed by Moore, a crashing sound can be heard, and Moore can be heard yelling repeatedly, "No, Vito, no," and "Vito, don't do this to me." The line remained open recording Marrugo's assault on Moore. In the audio, Marrugo can be heard telling Moore to get up and repeatedly yelling expletives at her. Eventually, Moore's mother arrived at the house and can be heard confronting Marrugo about beating her daughter.

Moore testified that Marrugo had repeatedly hit her, kicked her, choked her, and stomped on her face. A photograph of Moore's injuries showed the imprint of the sole of Marrugo's shoe on her face. Moore testified that Marrugo's beating had caused her to black out "for a good minute."

Deputy S. Harris, an investigator with the Harris County Sheriff's Office, photographed the scene, including the broken window by the front door, which had blood on it. Deputy Harris spoke with Marrugo and with Moore at the scene. Deputy Harris testified that Marrugo had lacerations and blood on his arms and on his shirt. She deduced that Marrugo had cut his arms when he broke the window. Marrugo told police, "I'll take charges. I'll take charges." As recorded by Deputy Harris's body-worn camera, Moore told police that Marrugo had broken into her home

4

through the window and assaulted her. Moore also told Deputy Harris that Marrugo did not live with her. She said Marrugo's address was on Havner Street. Paramedics arrived on the scene to treat Moore and Marrugo for their respective injuries.

At trial, the State offered the testimony of three witnesses: (1) Deputy Harris, (2) a paramedic dispatched to the scene, and (3) Moore. The defense sought to impeach Moore with three prior felony convictions and with her deferred-adjudication status. Moore had been convicted of felony possession of a controlled substance in 2015 and again in 2019. She had also been convicted of robbery in 2012. At the time of trial, Moore was on deferred adjudication community supervision for the felony offense of child endangerment.

The State objected that the defense should not be permitted to impeach Moore with her prior convictions because the prejudicial effect of the evidence outweighed its probative value. The State asserted that evidence of Moore's deferred-adjudication status was not admissible because it was not a final conviction.

The trial court permitted Marrugo to elicit testimony from Moore on cross-examination that she had three prior felony convictions and to ask her the year of each conviction. The court also allowed Marrugo to elicit testimony that Moore had received deferred adjudication for a felony. However, the trial court did not permit the defense to ask Moore the specific names of the felony offenses for which she

was either convicted or on deferred adjudication. Marrugo objected to the trial court's exclusion of the names of the offenses.

The parties' exhibits admitted at trial included the audio from the 9-1-1 call, the video footage from Deputy Harris's body-worn camera, photographs taken by Deputy Harris at the scene, including a photograph of the broken window, and medical records reflecting the paramedics' treatment of Marrugo and Moore.

The jury found Marrugo guilty of the offense of burglary of a habitation. During the punishment phase, Marrugo pleaded "not true" to the two enhancement paragraphs in the indictment. The jury found both enhancement paragraphs to be true and assessed Marrugo's punishment at 25 years in prison.

This appeal followed.

## Sufficiency of the Evidence

In his first issue, Marrugo contends that the evidence was not sufficient to support his conviction.

### A. Standard of Review

We review a challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). Pursuant to the *Jackson* standard, we "consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror

could have found the essential elements of the crime beyond a reasonable doubt." *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 243 (Tex. Crim. App. 2019) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *see Jackson*, 443 U.S. at 319. We hold evidence to be insufficient under the *Jackson* standard when (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 320).

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326.

Our review of the record includes all of the evidence introduced, whether it was properly or improperly admitted. *See Winfrey*, 393 S.W.3d at 767 (stating courts consider admissible and inadmissible evidence presented at trial when conducting sufficiency analysis). Direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of

an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper*, 214 S.W.3d at 13. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.*

## B.    Analysis

As relevant here, a person commits the offense of burglary of a habitation if, without the effective consent of the owner, he enters a habitation with the intent to commit assault. *See* TEX. PENAL CODE § 30.02(a)(3).

### 1.    *"Ownership" of the Marine Street House*

On appeal, Marrugo disputes the element of ownership. Essentially, he argues that he was an "owner" of the house and cannot be guilty of burglarizing his own residence. "The Penal Code imparts a specialized and technical meaning to the word 'owner,' defining it as a person who (1) has title to the property, (2) possession of the property, or (3) a greater right to possession of the property than the actor." *Morgan v. State*, 501 S.W.3d 84, 91 (Tex. Crim. App. 2016) (citing TEX. PENAL CODE § 1.07(a)(35)). The Penal Code defines "possession" to mean "actual care, custody, control, or management." TEX. PENAL CODE § 1.07(a)(39).

"The Penal Code definition of 'owner' clearly indicates that a defendant who has some, but less, right to control a habitation than the alleged owner may be prosecuted for burglary." *Morgan*, 501 S.W.3d at 91. The determinative question is

not whether Marrugo had a right to possess the Marine Street house, but whether Moore's right to possess the property was greater than Marrugo's right. *See id.*

Here, evidence was presented showing that Moore had a greater right of possession of the house than did Marrugo. Moore testified that, on the date of the offense, only she and her son lived in the Marine Street house. Although she could not remember whether Marrugo's name was on the house's lease, Moore testified that her name was on the lease. She explained that Marrugo was "suppose to" move in with her, but he never moved in "because . . . all [they] ever did was fight." Moore testified that Marrugo lived with his mother. Other evidence showed his mother lived on Havner Street.[1] The body-worn camera footage showed that, at the scene, Moore told Deputy Harris that Marrugo did not live at her house, and she gave his address as the Havner Street address. Moore's testimony and statement to Deputy Harris was corroborated by Marrugo's medical records related to the treatment of his injuries that night. The medical records listed his address as the Havner Street address.

Moore also testified that Marrugo did not have a key to the house. Her testimony was corroborated by evidence showing that Marrugo resorted to breaking the window by the front door to enter the residence.

---

[1]     Marrugo's sister testified for the defense and stated that their mother's address was on Havner Street.

9

Moore acknowledged that, on a single occasion, Marrugo gave her a couple hundred dollars for rent. However, we cannot conclude that this one-time payment necessarily negated Moore's greater right of possession to the house, which she rented for one and a half years. Nor does the fact that Marrugo occasionally slept at the house and kept a couple of changes of clothes there. *See Aldana v. State*, No. 04-18-00369-CR, 2018 WL 6331025, at *2 (Tex. App.—San Antonio Dec. 5, 2018, no pet.) (mem. op., not designated for publication) (concluding that appellant did not have equal or greater right of possession than victim, even though appellant occasionally spent night and made single contribution of $400 toward rent).

Marrugo asserts that the State failed to prove that Moore had a greater right of possession of the Marine Street house because Moore testified that she could not recall whether he was also named as a tenant in the lease. We disagree.

As discussed, evidence was presented affirmatively showing that Moore was a named tenant in the lease but no evidence affirmatively showed the same was true for Marrugo. Moreover, even assuming for the sake of argument that Marrugo was named in the lease, the evidence demonstrated that Moore was the "owner" of the house because she exercised actual care, custody, control, or management of the residence. *See* TEX. PENAL CODE §§ 1.07(a)(35), (39). The Third Court of Appeals reached a similar conclusion in *Mack v. State*, a case in which the court held that the

10

evidence was sufficient to prove the offense of burglary of a habitation, even though the defendant had signed the lease as a cotenant:

> Appellant's position cannot withstand, on this factual record, a straightforward application of the "greater right to possession" doctrine. The record clearly shows that, at the time of the offense, [the complainant] had a greater right than appellant to custody and control of the apartment. Appellant voluntarily moved out, removed almost all of his possessions from the apartment, and began living with his parents. Appellant stopped paying rent or utilities, and [the complainant] repaid him for his portion of the deposit. Appellant agreed not to visit the apartment unless he first called for permission. Appellant's only remaining claim to an interest in the apartment was the fact that his name remained on the lease contract. However, the greater right of possession doctrine does not credit rights that are unrealized at the time of the offense; instead, we must compare the parties' *actual* rights to custody and control of the property *on the date of the offense*. Even if appellant could have regained possession of the apartment by virtue of his contractual rights, he had voluntarily abandoned those rights on the date of the offense and had far less right, *at that time*, to control of the apartment than did [the complainant].

928 S.W.2d 219, 223 (Tex. App.—Austin 1996, pet. ref'd) (citations omitted).

Similarly, here, Moore testified that Marrugo never moved in and only had a few belongings at the house. On the night of the offense, Moore locked the door and would not let Marrugo in despite his repeated demands and knocking on the door. Marrugo did not have a key and forced his way in by breaking a window. Thus, given her actual right of custody and control of the property on the date of the offense, the evidence showed that Moore was the "owner" of the property, even if Marrugo was on the lease. *See id.*; *see also Davis v. State*, 586 S.W.3d 586, 589 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (holding that, even though

11

defendant had permission to come and go from apartment as he wished, evidence showing (1) that complainant would not let defendant into apartment when he repeatedly pounded on door and (2) that defendant entered apartment by breaking a window was sufficient to show that complainant was "owner" of apartment because complainant was in possession of apartment, that is, she had actual "care, custody, control, or management of the apartment" at time of offense).

In support of his challenge to the ownership element, Marrugo also points to the testimony of his sister, Lisa, called by the defense. He relies on her direct-examination testimony that Moore told her that Marrugo had moved into the Marine Street house. She also stated that she visited Moore and Marrugo at the house and observed Marrugo's belongings there. However, on cross-examination, her testimony deviated from her direct-examination testimony. On cross-examination, Lisa testified that Marrugo had lived with their mother from 1995 until the day of his arrest for the burglary offense, indicating that Marrugo had never resided at the Marine Street house. Lisa then stated that Marrugo was living "between" his mother's house on Havner Street and Moore's house.

The jury, as the trier of fact, is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony, and reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000). A jury may choose to believe some

testimony and disbelieve other testimony. *Id.* Thus, the jury, here, was free to believe Moore's testimony that Marrugo never lived in her home, to disbelieve Lisa's testimony to the extent it was to the contrary, and to believe the portion of Lisa's testimony indicating that Marrugo lived with his mother on the date of the offense.

## 2. *Effective Consent to Enter*

Marrugo also disputes the element of effective consent, asserting that the evidence did not show that he lacked consent to enter Moore's home. Whether a defendant had effective consent to enter is "measured at the time of the accused's alleged criminal act." *Morgan*, 501 S.W.3d at 92.

Moore testified that she and Marrugo argued in the car, he got out of the car, she drove home alone, she locked the front door when she arrived home, and she would not open the door for Marrugo when he knocked and demanded entry. She testified that Marrugo then forced his way into her home by breaking a window. The Court of Criminal Appeals has held that "the testimony of an owner that she did not give permission to enter the habitation is 'sufficient to establish the absence of effective consent.'" *Id.* (quoting *Ellett v. State*, 607 S.W.2d 545, 550 (Tex. Crim. App. [Panel Op.] 1980)). Here, Moore provided such testimony.

Evidence of Marrugo's use of force to enter the home was also probative of a lack of consent. The photographic evidence showed the broken window, and Deputy Harris described the damage to the window. Deputy Harris also described the

injuries to Marrugo's arm and the blood on his arms and shirt. She testified that Marrugo had been injured by breaking the window with his arm. *See Mims v. State*, 434 S.W.3d 265, 273–74 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (holding defendant's kicking in front door was evidence of lack of consent).

Marrugo contends that his medical records, related to the paramedic's treatment of his injuries, undermined Moore's testimony that he had broken the window to enter her home. Specifically, Marrugo points to an entry in the record noting that he told the paramedic that he had punched the window from inside the home to purposefully harm himself.

On appeal, Marrugo also contends that the video footage from Deputy Harris's body-worn camera showed that Moore had given her consent for him to enter the house. Early in the video footage, Moore told Deputy Harris that, on the way home from dinner, Marrugo yelled at her in the car, grabbed the steering wheel, and caused the car to hit a wall. She stated that Marrugo hit her after they arrived home. At trial, Marrugo argued that Moore's statement indicated that they had entered the home together. But Marrugo's argument failed to acknowledge that Moore had immediately clarified her statement.

After Moore stated that Marrugo hit her after they arrived home, Deputy Harris asked Moore how the window had gotten broken. Moore responded that she had left Marrugo alongside the road and had driven home alone. She said that

14

Marrugo arrived at her house and banged on the door. She explained that Marrugo entered her home by breaking the window and then began beating her. On further questioning by the officers at the scene, Moore continued to state that she arrived home alone and that Marrugo had entered her home by breaking the window.

We are mindful that, when there is a conflict in the evidence, we presume that the jury, as the trier of fact, resolved the conflict in favor of the judgment. *See Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012). Thus, any conflict in the evidence regarding how Marrugo injured his arm or whether Moore and Marrugo entered the home together was for the jury to resolve, and we presume it did so in favor of the judgment. *See id.*; *see also Rangel v. State*, 179 S.W.3d 64, 69 (Tex. App.—San Antonio 2005, pet. ref'd) (holding that jury was free to believe complainant-owner's statement to police on date of offense that defendant did not have consent to enter home on day of burglary, and to disregard complainant-owner's inconsistent testimony that defendant "always" had permission to enter).

### 3.    *Conclusion: evidence was legally sufficient*

We conclude that a rational jury could have found beyond a reasonable doubt that Moore was the "owner" of the house at the time of the offense. *See* TEX. PENAL CODE § 1.07(a)(35). We also conclude that a rational jury could have found beyond a reasonable doubt that Marrugo entered the house without Moore's effective consent. *See Morgan*, 501 S.W.3d at 92; *Rangel*, 179 S.W.3d at 69 (concluding

15

evidence was sufficient to establish lack of consent where appellant previously had been given access to residence, but owner testified that accused was not given permission to enter on day of offense). Accordingly, we hold that the evidence was legally sufficient to support the judgment of conviction for the offense of burglary of a habitation.

We overrule Marrugo's first issue.

### Admission of Impeachment Evidence

In his second issue, Marrugo contends that the trial court abused its discretion when it excluded (1) the names of the offenses for Moore's three prior convictions and (2) the name of the offense for which she received deferred adjudication.

### A.    Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.*

### B.    Felony Convictions

Assuming, without deciding, that the trial court abused its discretion by excluding the names of the three offenses for which Moore was convicted—that is, not permitting the jury to hear that Moore's prior convictions were for drug possession and robbery—we conclude that any error in doing so was harmless.

16

Generally, the erroneous admission or exclusion of evidence is non-constitutional error reviewed under the harmless-error standard in Rule of Appellate Procedure 44.2(b). *See Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). However, the exclusion of evidence may rise to the level of constitutional error if the excluded evidence "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.*

Here, the record reflects that Marrugo defended against the burglary offense by pointing to evidence that he claimed showed that Moore was not the owner of the house and that she had given him consent to enter. Moreover, as discussed below, Marrugo was permitted to elicit impeachment evidence bearing on Moore's credibility. Thus, the record does not reflect that the exclusion of the names of Moore's prior offenses prohibited Marrugo from presenting a defense, and we conclude that the harmless-error standard in Rule 44.2(b) applies.

Under Rule 44.2(b), any non-constitutional "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014) (citing *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002)). In assessing the likelihood that the jury's decision was adversely affected by the error, an appellate court considers everything in the record. *Id.* This

17

includes testimony, physical evidence, jury instructions, the State's theories, any defensive theories, closing arguments, and voir dire, if applicable. *Id.* Important factors include the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case and may include whether overwhelming evidence of guilt was present. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).

After reviewing the entirety of the record, we are convinced that the exclusion of the names of the offenses committed by Moore did not have a substantial and injurious effect or an improper influence on the jury's verdict. The trial court permitted the defense to elicit testimony from Moore that she had a felony conviction in 2012, a second felony conviction in 2015, and a third in 2019. The jury also heard that Moore had received deferred adjudication for a fourth felony. In other words, the jury knew that Moore, a three-time convicted felon on deferred adjudication for a fourth offense, had a propensity for breaking the law.

With respect to considering Moore's convictions, the trial court's charge instructed the jury as follows:

> You are further instructed that any evidence that any witness has been charged or convicted of any crime was admitted before you for the purpose of aiding you, if it does aid you, in passing upon the credibility of the witness and the weight to be given his testimony, and you will not consider the same for any other purpose.

Based on this instruction, the jury was permitted to consider Moore's felony convictions when assessing her credibility. Knowing the names of Moore's offenses would have added little to that assessment in this case. The two drug offenses had low impeachment value because possession of a controlled substance does not involve deception nor is it a crime of moral turpitude. *See Valmana v. State*, 605 S.W.3d 490, 505 (Tex. App.—El Paso 2020, pet. ref'd). The offense of robbery contains certain elements of deception and violence, *Leyba v. State*, 416 S.W.3d 563, 572 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd), but Moore's robbery conviction was the oldest of three convictions, lessening its impact. Without knowing the names of the offenses, the jury was left to wonder about the nature of the offenses and whether Moore had committed offenses with higher degrees of deception or violence than the actual offenses of which she was convicted. Thus, as the State points out, the defense may have actually benefitted from the exclusion of the names of the offenses.

Moreover, as discussed, ample evidence was admitted corroborating Moore's testimony. The record showed that Marrugo's arms were cut by the glass, and he admitted to breaking the window. The 9-1-1 audio captured the incident, including a crashing sound at the beginning of the call along with Moore's pleas for Marrugo to stop assaulting her. And, as Moore testified, Marrugo's medical records indicated that his address was not the Marine Street house. Even portions of defense witness

Lisa's testimony corroborated Moore's testimony that Marrugo never resided at the Marine Street house.

After examining the record as a whole, we conclude that the exclusion of the names of the offenses of which Moore was convicted did not affect Marrugo's substantial rights because we have a fair assurance that the error did not influence the jury or had but a slight effect. *See Motilla*, 78 S.W.3d at 355. We hold that any error in excluding the evidence was not harmful error. *See* TEX. R. APP. P. 44.2(b).

## C. Deferred-Adjudication Offense

At the time of trial, Moore was on deferred adjudication for the felony offense of child endangerment. The State objected to Marrugo eliciting testimony from Moore about her deferred-adjudication status. The trial court overruled the State's objection and allowed Marrugo to elicit testimony from Moore that she was currently "on deferred adjudication" for a felony. However, the trial court did not permit Marrugo to elicit the name of the offense. Marrugo objected to the exclusion of the offense's name. On appeal, Marrugo contends that he should have been permitted to elicit testimony from Moore that the deferred offense was for child endangerment.

Generally, if certain criteria are met, evidence of a conviction may be elicited from a witness for the purpose of attacking the witness's credibility. *See* TEX. R. EVID. 609(a). Deferred adjudication is not a conviction. *Beedy v. State*, 194 S.W.3d

20

595, 599–600 (Tex. App.—Houston [1st Dist.] 2006) *aff'd*, 250 S.W.3d 107 (Tex. Crim. App. 2008).

At trial, Marrugo asserted that he could impeach Moore with her deferred-adjudication status because it showed that she was biased and motivated to testify favorably for the State. But a witness's "mere status" of being on deferred adjudication community supervision is not sufficient, by itself, to establish a potential bias or motive to testify favorably for the State. *See Irby v. State*, 327 S.W.3d 138, 152 (Tex. Crim. App. 2010). Instead, to cross-examine a witness about her deferred-adjudication status, the proponent of the evidence must establish some causal connection or logical relationship between the witness's probationary status and the witness's potential motive to testify for the State. *See id.* at 148–49. In other words, the proponent of the evidence must "show a logical connection between the fact or condition that *could* give rise to a potential bias or motive and the existence of any bias or motive to testify." *Id.* at 149–50; *see also Juneau v. State*, 49 S.W.3d 387, 390 (Tex. App.—Fort Worth 2000, pet. ref'd) (noting that "[a]ppellant must make some showing that [the witness's] version of the facts might be a result of his deferred adjudication status"). In short, a party seeking to introduce evidence of a witness's deferred-adjudication status who cannot establish a causal connection has essentially failed to demonstrate that the evidence he seeks to introduce is relevant

to the allegation of bias. *See Johnson v. State*, 433 S.W.3d 546, 552 (Tex. Crim. App. 2014).

Here, Marrugo did not offer or seek to offer any evidence to show a causal connection between Moore's deferred-adjudication status and any bias or motive she had to testify for the State. Thus, because it would not have been an abuse of discretion for the trial court to exclude evidence of Moore's deferred-adjudication status altogether, it follows that it was not an abuse of discretion for the trial court to exclude the name of the offense for which Moore received deferred adjudication. *See Irby*, 327 S.W.3d at 147–48; *see also Chauncey v. State*, No. 14-17-00327-CR, 2018 WL 3237154, at *4 (Tex. App.—Houston [14th Dist.] July 3, 2018, no pet.) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion in excluding evidence of witness's deferred adjudication because appellant failed to offer evidence of "logical connection between [witness's] deferred adjudication and his possible motive to curry favor with the prosecution").

We overrule Marrugo's second issue.

### Modification of Trial Court's Judgment

We raise a third issue sua sponte: our review of the record revealed a clerical error in Marrugo's judgment of conviction. Specifically, although the jury charge reflects that the jury found both enhancement paragraphs in the indictment to be true, the judgment incorrectly states that the jury found them to be not true.

This Court has the authority to modify a judgment to make the record speak the truth when we have the necessary information before us to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Our authority "to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court." *Munguia v. State*, 636 S.W.3d 750, 756 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). Rather, "[an] appellate court may act sua sponte and may have the duty to do so." *Asberry v. State*, 813 S.W.2d 526, 530 (Tex. App.—Dallas 1991, pet. ref'd) (en banc). Accordingly, we modify the trial court's judgment to reflect that the jury found the first and second enhancement paragraphs in the indictment to be true.

## Conclusion

As modified, we affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

Do not publish. Tex. R. App. P. 47.2(b).

23